MINE & SMELTER SUPPLY CO. v. BRAECKEL CONCENTRATOR CO. et al.

(District Court, W. D. Missouri, S. W. D. July 8, 1912.)

No. 150.

1. PATENTS (§ 327*)—SUITS FOR INFRINGEMENT—PRIOR DECISIONS.

While the obligation of comity as applied to patent cases is not imperative, it is something more than courtesy, since it has a substantial value in securing uniformity of decision.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 620–625; Dec. Dig. § 327.*]

2. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—AMENDMENT OF APPLICATION.

The Wilfley patent, No. 590,675, for an ore concentrator, discloses patentable novelty and invention and a very high degree of utility, and is not invalid because of amendments made to the specification and claims while the application was pending in the Patent Office not shown to have been verified; such amendments having been well within the original invention as shown by the drawings and therefore within the scope of the original oath and by way of amplification of description. Claims 1, 2, and 7 also held infringed.

3. PATENTS (§ 109*)—VALIDITY—AMENDMENT OF APPLICATION.

In determining whether matter introduced into an application for a patent by way of amendment is new matter, the original drawings are

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

to be understood with such variations in form, shape, and proportions as common sense and mechanical skill in the art would suggest.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 152; Dec. Dig. § 109.*

Amendment of application for patent, see notes to Cleveland Foundry Co. v. Detroit Vapor Stove Co., 68 C. C. A. 239; Hestonville, M. & F. Pass. Ry. Co. v. McDuffee, 109 C. C. A. 613.]

In Equity. Suit by the Mine & Smelter Supply Company against the Braeckel Concentrator Company and O. W. Dunham. On final hearing. Decree for complainant.

A. E. Spencer, of Joplin, Mo., and George L. Hodges and D. Edgar Wilson, of Denver, Colo., for complainant.

Paul Bakewell, of St. Louis, Mo., and H. S. Miller, of Joplin, Mo., for defendants.

VAN VALKENBURGH, District Judge. This is a bill for infringement of claims 1, 2, and 7 of letters patent No. 590,675, issued September 28, 1897, for new and useful improvements in ore concentrators. It contains the usual prayer for injunction, accounting, and damages. The defenses, upon which the defendants rely, in the order in which they will be considered, are:

(1) That as to the defendant Dunham, there is no proof in support of the allegations of the bill that he is connected in any way with the alleged infringement.

(2) That the patent in suit, as to all the claims in issue, is destitute of patentable novelty and invention.

(3) "That in respect of the alleged invention or inventions the subject-matter of claims 1, 2, and 7, as a reference to the file wrapper and contents of the Wilfley patent in suit will show, the conditions and requirements of the law (see paragraph 2 of the answer) were not complied with in this, that, after the original application had been filed in the United States Patent Office, substantial and material changes were made both in the specifications and claims, describing and claiming in the amendments to the specification and claims substantial departures from the thing described and claimed in his original application, without accompanying these substantial amendments to the specification and claims by a new oath, by reason of which, in accordance with the doctrine laid down by the Supreme Court in Steward v. American Lava Co., 215 U. S. 161–168 [30 Sup. Ct. 46, 54 L. Ed. 139], the patent in suit, especially as to claims 1, 2, and 7 (the claims in issue), is void."

(4) "That neither of the defendants has infringed any of the claims in issue."

1. The first contention may be easily disposed of. It was not contended at the argument, nor in the briefs, that the proofs connected the defendant Dunham specifically with the alleged infringement, and as to him the bill was dismissed.

2. Next, as to the contention that the patent in suit, as to all the claims in issue, is destitute of patentable novelty and invention:

[1] This patent has already been considered in this circuit in the case of Wilfley v. Denver Engineering Works et al. (C. C.) 111 Fed. 760, decided November 5, 1901. In that case Judge Riner held that it possessed both novelty and invention within the meaning of

the patent law. It is, of course, true that the decision in that case is not binding upon this court. As has been said, the obligation of comity is not imperative; but it is something more than mere courtesy, which implies only deference to the opinion of others, since it has a substantial value in securing uniformity of decision, and discouraging repeated litigation of the same question. It applies, of course, only to questions which have been actually decided, and which arose under the same facts. Mast-Foos & Co. v. Stover Mfg. Co., 177 U. S. 488, 20 Sup. Ct. 708, 44 L. Ed. 856; Torrey v. Hancock, 184 Fed. 67, 107 C. C. A. 79.

[2] The general features of this invention are discussed with sufficient fullness and particularity in Judge Riner's opinion, and reference thereto is made in order to avoid unnecessary repetition here. The question now under consideration was thus stated by him:

"First. Can the combination claims 1, 2, and 7 of the Wilfley patent in suit be construed and interpreted by the court to cover an invention new and patentable at that time?

"I think the first question must be answered in the affirmative. Even if it be established that the arrangement of the table is merely the application of an old article to a new use, it does not follow that the patent is necessarily void. If we concede that the riffle was old, and that the smooth surface of the table was old, it by no means follows that the application, in the manner shown in the claims set forth, of the riffles to the smooth surface, substantially as described in the patent, is merely applying the riffles to a new use, in the sense in which, in the law of patents, the mere application of an old article to a new use is held not to be the subject of a patent.

" * * * While it is difficult in many cases to determine where skill ends and invention begins, I think it perfectly clear, from the evidence, that here a new and useful result was accomplished in the matter of ore concentration, which cannot be said to have been perfectly obvious. The prior art discloses no combination of the elements of the Wilfley patent in the way which he describes. The minds of inventors and those interested in the art had been specifically directed to the question of the separation of the values from the gangue, for many years prior to the Wilfley patent, yet neither the defendants nor any one else conceived the idea that this result could be best accomplished by subjecting the pulp upon the table to the repeated interference of the riffles placed upon the table in the manner described in the patent, and at the same time and in the same manner protect the values lower down on the table from the cross-wash of the water laden with the waste from the riffles higher up. This arrangement was new, and, as the testimony clearly establishes, useful and valuable.

"He solved a problem in ore concentration that had never before been answered, by adjusting riffles, of unequal length, one in advance of the other, the shorter being at the top, so that they not only protect the mineral deposited at the head end of the table, but offer a succession of riffles to the cross-flow of the gangue and values which wash down from the riffles above, and thereby saves the values which, coming from the top of the table, would otherwise be washed across the table. When the discovery was made and explained to the public, it could readily be seen by other inventive and mechanical minds that the means whereby the result was produced were very simple and plain, and it became apparent to him, as it now is to others, that the same results could be brought about by various changes that might be made in the construction of riffles. Hence he said in his specifications, 'I do not limit the invention to any special construction of riffle.'"

It is true, as has been said, that this court is not obliged to adopt that conclusion. It does not appear in the record what state of the prior art was brought to Judge Riner's attention. New and addi-

tional evidence might operate to change his view; but the patent itself was under consideration, and that a fair presentation of the prior art was also made, must be presumed. Furthermore, from the argument upon the evidence adduced in the case at bar, and before consulting this prior decision, I reached the same conclusion as to these features of novelty and invention, and my views have been strengthened, rather than changed, by a more careful and exhaustive review in chambers. It is my opinion that in this combination of riffles of unequal length with a comparatively smooth surface, in a table subjected to the movements described in this patent, a result has been attained not before known and realized, and of great utility in this art. The subjection of the mass to be separated to repeated agitation and washings, at comparatively frequent intervals, at the points of the successive riffles, whereby hand panning is mechanically effected, repeated separation and elimination produced, with the result that the ore values are more certainly and effectively directed to the proper discharge point of the table, and the finer particles not only separated, but preserved, is an idea never conceived, much less attained, in the prior art, presents novelty and invention and a very high degree of utility. This is further evidenced by the very general and extensive use of this device. I therefore find that the patent discloses novelty, invention, and utility.

3. We come now to the third defense, especially emphasized in argument and brief. This is that in the specification and claims in issue the patentee made a substantial departure from the application originally filed, introduced new matter, a new function, and described an entirely different invention, all unaccompanied by a new or supplemental oath; for which reason, it is contended, the patent, especially as to the claims in issue, is void. It should be remembered that this patent duly issued carries with it the presumption of regularity. It is presumed that the commissioner did and exacted what the law required him to do and exact, and the burden is upon the alleged infringer to overcome this presumption. The statute does not, in terms, demand that the oath required should be in writing, and it has been held that such a requirement is not implied. In Hancock Inspirator Co. v. Jenks (C. C.) 21 Fed. 911, Judge (afterwards Justice) Brown said:

"There is nothing in the act requiring this oath to be in writing, and, notwithstanding the existence of the supplementary application, verified by the attorney, it is possible that the patentee appeared personally before the commissioner and made the requisite oath in his presence. The commissioner, having general jurisdiction of the subject, is presumed to have complied with all the requirements of the law before issuing the patent. Indeed, the courts have gone so far as to hold that the presence in the files of the Patent Office of a paper purporting to be an oath, but void for want of a jurat, will not defeat the patent."

At this hearing Mr. Justice Matthews sat and concurred in the decision. So far as appears in the case at bar, counsel for defendants rely upon the single fact appearing in the record that the file wrapper and contents introduced in evidence do not disclose the presence of a supplemental oath to the amended specification and claims.

In Hoe v. Kahler (C. C.) 25 Fed. 271, 279, Mr. Justice Blatch-' ford, sitting at circuit, held that the mere failure of the file wrapper and contents to disclose whether the application was properly verified or not was not sufficient to rebut the presumption that the commissioner required and received a proper preliminary oath. He says:

"The affirmative probative force of a paper in a file wrapper, to show the existence of its contents, is one thing, but its negative probative force, to show that a paper or a fact not shown by anything in its contents did not exist, is quite a different thing. The fact that papers known to have existed, and which properly belonged in a file wrapper, are missing therefrom, is a fact of such frequent occurrence in patent suits as to have become a matter of judicial cognizance."

To the same effect, see American Steel Foundries v. Wolff Truck Frame Co. (C. C.) 189 Fed. 601, 602. It does not appear that the defendant has sufficiently rebutted the presumption raised by the issuance of the patent.

But waiving this somewhat technical answer to an equally technical defense, let us inquire whether the patentee did, in fact, inject such new matter into his specification and claims as to make verification necessary. In his original specification he says:

"I declare the following to be a full, clear, and exact description of the invention, such as will enable others skilled in the art to which it appertains to make and use the same, reference being had to the accompanying drawings, and to the letters and figures of reference marked thereon, which form a part of this specification.

"My invention relates to improvements in ore concentrators; and it consists of the features hereinafter described and claimed, all of which will be fully understood by reference to the accompanying drawing in which is illustrated an embodiment thereof."

It is unusual, and indeed unnecessary, to find drawings more explicitly made a part of the specification. These drawings show the table exactly as patented. No change whatever was made in the drawings except to add the letter "A" to the unriffled surface for greater particularity. The specification then, among other things, recites:

"The table tapers from the head toward the foot, where it is narrowest"— a description exactly conforming to the drawing. "The riffles increase in length from the upper edge of the table downward, where they are longest. The lowermost riffle extends nearly the full length of the table."

The mechanism for actuating the table is then described, and later on this is found:

"The mineral is caught by the riffles and the concentrates discharged as a comparatively clean product at the lower right-hand corner of the table. By means of the riffles, the separation of the mineral from the gangue is effected. They check the tendency of the mineral to move transversely downward with the gangue. * * * It is well known that the finest particles of mineral can be saved by hand panning. The specific gravity of the finest particle of gold is, of course, the same as the largest nugget, and if the proper conditions exist, the minute particles can be saved as well as the nugget. The object of my angular riffles is to produce the conditions necessary to save, not only the largest, but also the finest, mineral particles. * * * These mineral particles are, however, gradually moving toward the tail of the table under the influence of the latter's movement imparted

by the operating mechanism heretofore explained. Hence, when the mineral reaches the free extremity of the uppermost riffle, it is, for a brief space of time, subjected to the free or unrestrained action of the water before passing to the riffle next below. During this space of time, it is deprived of some gangue which was also caught by the first riffle. The gangue once separated is carried downward by the water, while the mineral is caught by the next riffle and so on; each riffle in turn delivering a cleaner concentrate to the riffle next below until the lowermost riffle discharges the clean product at the lower right-hand corner of the table."

This, of course, presupposes that the mineral upon reaching the free extremity of the uppermost riffle, and successively thereafter, emerges upon an unriffled portion of the table, where, for a brief space of time, it is subjected to the free or unrestrained action of the water before passing to the riffle next below. A necessarily ample space for the operation described would be implied and is actually disclosed by the drawing expressly referred to. A construction eliminating the upper right-hand corner of the table shown in the drawing from a diagonal line running from the extremity of the uppermost riffle to that of the lowermost riffle, leaving practically no space at the extremity of the riffles, as suggested by counsel for defendant, would involve a literalness in interpretation that would defeat to a harshly unjust degree the avowed purpose and operation of the mechanism described. Obviously, this unriffled portion of the table was essential to the operation and was read into the specification by explicit reference to the drawing as a true embodiment. The function in itself was sufficiently described. Subsequently, in the specification and claims of the patent, as finally issued, whether at the suggestion of the examiner, or partially upon the applicant's own motion, or both, this function and the construction are described more explicitly and in detail, but without substantial alteration or departure. If there was any objection to the original specification, it was because it said too little rather than too much in the way of description, and nothing originally said was abandoned, but was included in the later amplification. For the procedure disclosed, in all its features, there is abundant authority founded upon obvious equitable principles.

[3] It will be conceded that amendments, within the scope of the original oath and of the invention described in the original specification, are allowable and do not require additional verification. De La Vergne Refrigerating Machine Co. v. Featherstone, 147 U. S. 209, 13 Sup. Ct. 283, 37 L. Ed. 138. In determining whether matter introduced into an application by way of amendment is new matter, the original drawings are to be understood with such variations in form, shape, and proportions as common sense and mechanical skill in that art would suggest. Michigan Cent. R. Co. v. Consolidated Car-Heating Co., 67 Fed. 121, 14 C. C. A. 232. The court said:

"This carries the doctrine to its verge, and if the original drawings and specifications fail to indicate to those familiar with the art, and having the mechanical skill peculiar thereto, the device which is introduced by the amendment, then the patent does not include that device."

If they do so indicate, then they are sufficient. It is obvious here that both the specification and drawings indicate the device, the func-

tion, and mode of operation, and any one possessing common sense and mechanical skill in that art could construct and operate the machine described. In Cleveland Foundry Co. v. Detroit Vapor Stove Co., 131 Fed. 853, 68 C. C. A. 233, the same court said:

"If the construction of a patentee effects the desired results, and they are beneficial, he does not lose the benefit of his invention because he may not have correctly understood the principles of its operation.

"If an inventor comes to better understand the principles of his invention while his application for a patent is pending, an amendment of his claims to conform thereto does not introduce any original matter nor enlarge his invention, and is within his legal right."

Here, the patentee did not misunderstand his invention. If there was any misunderstanding, and even that does not clearly appear, it was on the part of the examiner, and if the patentee then amplified his specification and claims the more clearly and definitely to explain his invention to Patent Office and public alike, he was clearly within his rights. Where new specifications and claims are filed in which the invention is stated much more in detail, and with much fuller and more accurate language than before, this does not necessarily expand the original claims beyond the scope of the invention, particularly where the original drawings and specifications suggest the claims finally made. Hobbs v. Beach, 180 U. S. 383, 386, 397, 21 Sup. Ct. 409, 45 L. Ed. 586.

The principle invoked by counsel for defendant usually arises where an applicant for a patent amends and limits his claims and specifications to meet objections of the Patent Office; whereby, in order to get his patent, he accepts one with a narrower claim than that contained in his original application. In such case, he is bound by the claim of the patent as issued. Hubbell v. United States, 179 U. S. 83, 21 Sup. Ct. 24, 45 L. Ed. 95; Brill v. St. Louis Car Co., 90 Fed. 666, 33 C. C. A. 213. And where an applicant for a patent, after his application has been rejected and lain dormant for years, during which time the art has made rapid progress, amends the same, and on the basis of such amendment makes claims of a different character, it is the duty of the court to scrutinize the patent issued carefully to see that it has not been enlarged in scope beyond the invention disclosed in the original application. Hestonville, M. & F. Pass. Ry. Co. et al. v. McDuffee et al., 185 Fed. 798, 109 C. C. A. 606.

In Computing Scale Co. v. Automatic Scale Co., 204 U. S. 609, 617, 27 Sup. Ct. 307, 310 (51 L. Ed. 645), a case was presented where an inventor seeking a broad claim, which was rejected, acquiesced in the rejection, and substituted therefor a narrower claim. It was held that he could not afterward insist that the claim allowed should be construed to cover that which was previously rejected. The court said:

"An examination of the history of the appellant's claim, as disclosed in the file wrapper and contents, shows that, in order to get his patent, he was compelled to accept one with a narrower claim than that contained in his original application; and it is well settled that the claim as allowed must be read and interpreted with reference to the rejected claim, and to the

prior state of the art, and cannot be so construed as to cover either what was rejected by the Patent Office or disclosed by prior devices."

But this significant language is added:

"It is quite true that where the differences between the claim as made and as allowed consist of the mere changes of expression, having substantially the same meaning, such changes, made to meet the views of the examiners, ought not to be permitted to defeat a meritorious claimant. While not allowed to revive a rejected claim by a broad construction of the claim allowed, yet the patentee is entitled to a fair construction of the terms of his claim as actually granted."

But counsel for defense rely mainly upon the case of Steward v. American Lava Co., 215 U. S. 161, 30 Sup. Ct. 46, 54 L. Ed. 139, holding that:

"A patent cannot be sustained when the theory and method are introduced for the first time in unverified amended specifications."

This is no new doctrine, and its application depends upon the facts in each particular case. In that case neither the drawings nor the specification disclosed anything definite, new, or patentable. "The drawings were merely diagrams," and in the specification "vacillation in theory led to uncertainty of phrase." The patentee was not at all clear respecting his own invention, and so was unable definitely to portray or describe it. As stated in the opinion:

"The claims were rejected on April 6, 1897, and in the same month Dolan changed his attorney. On May 20th a new specification and new claims were filed by the new attorney, but not sworn to by Dolan, and on these, with no material change, the patent was granted."

In this case the patentee was a witness in the case, and, as shown in the opinion of the court below (155 Fed. 737, 84 C. C. A. 157), characterized the idea disclosed by the amended specification as:

"A lawyer's trick for building up a theory of some kind, which at the time I didn't know anything about. There may be an envelope of air, and there may be a mixture. The whole matter is theoretical to my mind."

So that it affirmatively appeared that not only was the matter new and a substantial departure from the original application, but that the idea disclosed by it was not the invention of the applicant; was, in fact, repudiated by him, and was not, concededly, supported by his oath. The case was an extreme one, and presented facts beyond dispute calling for the ruling announced; but in that ruling Mr. Justice Holmes refers to other Supreme Court decisions which clearly distinguish that case from the one at bar. De La Vergne Machine Co. v. Featherstone, 147 U. S. 209, 13 Sup. Ct. 283, 37 L. Ed. 138, has already been referred to. In Railway Co. v. Sayles, 97 U. S. 554–563, 24 L. Ed. 1053, the practical principle involved is thus announced:

"Courts should regard with jealousy and disfavor any attempts to enlarge the scope of an application once filed, or of a patent once granted, the effect of which would be to enable the patentee to appropriate other inventions made prior to such alteration, or to appropriate that which has, in the meantime, gone into public use."

In Eagleton Mfg. Co. v. West, Bradley & Carey Mfg. Co., 111 U. S. 490–498, 4 Sup. Ct. 593, 597 (28 L. Ed. 493), the specification which accompanied the original application did not set forth the discovery that moderate heat, such as may be applied in japanning, will impart temper to the springs, but set forth merely the protection of the springs by japan.   Mr. Justice Blatchford said:

"The only invention to which the application and oath of Eagleton were referable was that of merely japanning steel furniture springs; the authority given to his attorneys was only to amend that application, and ended at his death; the amendments made were not mere amplifications of what had been in the application before; the patent was granted upon them without any new oath by the administratrix."

In Williams Co. v. Miller, etc., Mfg. Co. (C. C.) 107 Fed. 290, Judge Wheeler said:

"The fact that a new claim is inserted in an application for a patent by the attorneys for the applicant, without any new oath, does not render the patent invalid as to such claim, where it was within the invention described in the specification.
"* * * This seems to be well within the authority of attorneys to prosecute it, and according to the constant practice of the Patent Office."

In Western Electric Co. v. Sperry Electric Co. et al., 58 Fed. 186–196, 7 C. C. A. 164, 173, Judge Woods, speaking for the Court of Appeals for the Seventh Circuit, and with reference to an amendment to ·the application, said:

"At first Scribner, it is clear, believed the up-and-down compensating movement of the armature in the main circuit, irrespective of the action of the regulating magnet, to be an important feature of his lamp; but before the patent issued, without changing the drawing or modifying the structure of his device in the least, he presented an amended specification, in which he repudiated that idea, and described the armature in operation as assuming and holding a definite relation to the magnet. So long as he did not change the structure of his device or invention, he had the right to change the specification."

See American Steel Foundries v. Wolff Truck Frame Co. (C. C.) 189 Fed. 601.

It is a well-known fact that an imperfect or incomplete written description will be aided by correct drawings, and more particularly so when the drawings themselves are expressly made a part of the specification as constituting a true embodiment of the invention.

"Drawings are a part of the specification of a patent, and for the purpose of ascertaining the sufficiency of the description of the invention must be read with it."   Brammer v. Schroeder, 106 Fed. 918, 46 C. C. A. 41.

My conclusion is that the original specification, taken in connection with the drawings, specifically made a part of it, sufficiently described the device and the function covered by the claims in controversy; that the new specification and these claims were but amplifications merely adding clearness in description and detail to what was already sufficiently disclosed; and that they are therefore within the scope of the original invention and are valid.

4. Does defendant's machine infringe complainant's patent, and more particularly claims 1, 2, and 7 in issue?   Defendant's structure

employs a table somewhat more rectangular in shape, but of the general type of that disclosed in the patented device. At the upper or feed corner of the apparatus are arranged four riffles of varying length; the uppermost being the shortest. The longest of these extends about one-third the length of the table. Defendant claims that these are placed there for the purpose of checking the immediate tendency of the feed to be carried to the lower side of the table at the moment when first deposited upon the surface; that in this particular they operate partially as a dam and partially as a directing agent to carry the feed forward toward the center of the table where it may more fully be engaged by the agencies of separation. Nevertheless, the arrangement and formation is such that the consecutive separating and washing effect takes place immediately, after the manner disclosed in the Wilfley patent. Below, and a short distance to the rear of the extremity of the lowest and longest of these first four riffles, a diagonal dam starts, extending to the lower or tailings discharge side of the table at a point rather less than one-third of the length of the table from the concentrates discharge end thereof. Along the upper side of this dam are extended riffles parallel with the lower edge of the table and so arranged that the extremity of each projects somewhat farther toward the concentrates discharge end than the extremity of that next above it. Upon leaving the guiding and controlling influence of the four riffles first described, the mass to be further separated comes directly in contact with the riffles last named and is subjected to the same process as that disclosed in complainant's patent.

The contention is made that the arrangement of the riffles differs, in detail, from that shown and described in the specification and drawings of the patent in suit. Nevertheless, the arrangement is so substantially equivalent as to produce the same function, by the same means, and in substantially the same manner. It is also said that large values are discharged with the tailings, and that such tailings must be worked over in order to produce a satisfactory result. This, however, would disclose mere imperfection of application of the same device, which would not exempt from infringement. It is most strenuously insisted, however, that the unriffled portion of the table is not smooth, as in the Wilfley machine, and that therefore an essential element of the declared combination is lacking in the device charged with infringement. In the defendant's machine the unriffled surface is slightly roughened or grooved, which is supposed to aid in directing the concentrates toward their proper discharge end of the table. This leads to a considerable discussion as to what is meant by the word "smooth" in the patent in suit. The specification and claims show clearly that that term was employed to distinguish one portion of the table from the riffled portion of its surface. In claim 1 this section is described as "a smooth, plain, or unriffled portion"; in claim 2 "as a plain or unriffled portion"; in claim 7 "as a plain or unriffled portion of suitable area located at the extremities of the riffles." Clearly, then, the term is a relative one. A riffle, as used in this art and described in the testimony, is a strip or cleat of wood or metal superimposed upon the surface of the table in such manner as to afford a barrier or obstruc-

tion, with the effect described. The other portion of the table is one devoid of such riffles. The degree of smoothness may be varied as desired, provided it may co-operate with the riffles, aiding them to discharge their functions. The main requirement is that it should be plain or smooth in the sense of being unriffled.

This same condition was present in Wilfley v. Denver Engineering Works Co. et al. (C. C.) 111 Fed. 760, and Judge Riner disposed of it in the following language:

"Do the shallow grooves in the defendant's table, extending from the ends of the raised ribs or riffles to the end of the table, and through that portion of the table designated in the Wilfley patent as 'plain, smooth, or unriffled,' perform any other or different function? After a most careful study of this record, I have reached the conclusion that they do not. There is no doubt that the modification of the surface, in the operation of the Cammet table, tends to a great extent to guide the concentrates so as to distribute them across the entire end of the table, while the linoleum surface of the Wilfley table delivers them into the concentrates box lower down the table. But the surface over which the material is washed is the smooth broadened portion of the elevated riffles or ribs, forming the table's surface, and the bottom of the next groove or grooves, or, when the grooves are filled with material, which must necessarily be the case after the first few moments of operation, then over the material running therein, thus giving it ample opportunity to spread and be rewashed. This I think the evidence shows is the function performed by the Wilfley table.

"The improvement in the Cammet over the Wilfley table, if it is an improvement, consists in directing and delivering, by means of the grooves in that portion of the table designated as plain, smooth, or unriffled in the Wilfley patent, the concentrates into the receptacle provided therefor. It may be that the Cammet tables are an improvement upon the invention covered by the Wilfley patent in this respect, but it still has all the essential elements of the best form of Wilfley's invention. It performs the same function in substantially the same way, and therefore must be held to infringe it."

I concur in the conclusion there reached.

"If, however, one invents and secures a patent for a new combination of old mechanical elements which first performs a useful function, he is protected against all machines and combinations which perform the same function by equivalent mechanical devices to the same extent and in the same way as one who invents and patents a machine or composition of matter of like primary character." Brammer v. Schroeder, 106 Fed. 918, 46 C. C. A. 41.

"The statutory requirement that an applicant for a patent shall explain the best mode in which he has contemplated applying the principle of his invention does not preclude him from claiming any other mode which embodies his principle." Vrooman et al. v. Penhollow et al., 179 Fed. 296, 102 C. C. A. 484.

Some point is made as to differences in form and shape of the riffles employed, but in his specification the applicant said:

"While I prefer to employ the angular riffle shown and described in this application, I do not limit the invention to *any special construction of riffle.*"

It is the function of the riffles, and not their form, that controls. My conclusion is that the defendant's machine infringes the claims of complainant's patent as charged in the bill.

A decree will be entered accordingly.